IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PHILLIP GENTRY,

       Plaintiff,

v.                                              CIV 01-149 MCA/KBM

FRANK STEELE, et al.,

       Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION NO. 2

      Plaintiff is African American.  He claims that while housed as a federal pretrial detainee at the Dona Aña County Detention Center ("DACDC"), Defendant Gilbert McClure assaulted him while other unnamed detention officers participated or watched but did not come to his aid.  He claims that he was then denied medical care for his injuries.  He further alleges that the incident and its aftermath were part of a conspiracy and failure to adequately "train" the officers.

      This matter is before the court on Defendants' *Martinez* Report, a supplement and errata to it, motions for summary judgment, and motion to strike, as well as Plaintiff's objections and supplements to the *Martinez* Report and motions to hold this matter in abeyance, for discovery, and to strike.  *See Docs. 77, 78, 80, 84-85, 99, 102-103, 110, 114-116.*

      I recommend that Plaintiff's medical care and conspiracy claims be dismissed; that his First Amendment claim be subsumed in his excessive use of force claim, and the use of force claim be bifurcated and proceed to trial against McClure only in his individual capacity first.  Only in the event of liability on the use of force claim should the municipal liability claims proceed to discovery.

# I.  Procedural Background

When I issued my first set of proposed findings, only Defendant Frank Steele and Defendant Board of County Commissioners of the Doña Ana Detention Center ("Board") had been served.  I recommended that Plaintiff's complaint not be dismissed as untimely or for failure to exhaust administrative remedies, but that his § 1982 claim be dismissed.  *Doc. 71.*  No one filed objections to these recommendations.

Along with those recommendations, I issued various orders.  As a result, McClure was served and answered.  *Doc. 75.*  Thereafter, Steele, McClure, and the Board joined as parties to a *Martinez* Report.  *Doc. 77.*  Steele and the Board also filed two separate motions for summary judgment.  *Docs. 78, 80.*  In his Answer, Defendant McClure asserts, among other things, that he is entitled to qualified immunity and that his actions were reasonable.  He, however, has not moved for summary judgment apart from joining in the *Martinez* Report.

In my first set of proposed findings I noted further that in addition to the above three named defendants, Plaintiff also sues five unnamed "John Doe" officers and the unnamed "warden or chief administrator" of the prison.  *Doc. 71* at 2, *see also Doc. 1.*  In April 2001, this court gave Plaintiff a "reasonable time" within which to identify the Doe Defendants."  *Doc. 8.*  Plaintiff had not identified the unnamed defendants at the time of my first set of proposed findings in April 2002.  He has not done so to-date, either.

Both McClure and Steele are sued in their individual and official capacities.  *See e.g., Doc. 15* at 3; *Doc. 71* at 2-3; *Doc. 93* at 15; *Doc. 97* at 3-4.  McClure is sued as the detention officer who allegedly beat Plaintiff without provocation.  Steele is sued as Administrator of the Doña Ana County Detention facility when the event took place.  *See Doc. 1* at ¶ 3; *Martinez Report,* Exh. B,

¶ 1 (hereinafter "*Steele Aff.*").

Finally, the content of Plaintiff's earlier pleadings led me to note that they "appear to have been written by someone having a significant legal education - possibly an attorney." *Doc. 17* at n.1. Plaintiff's submissions continue to be of high quality, but he indicates that he is "rely[ing] on fellow inmates to respond to all of the pleadings filed by Defendants." *Doc. 97* at 18. Based on that representation, I conclude Plaintiff is proceeding entirely *pro se*.

## II. *Martinez* Report & Summary Judgment Practice

While a *Martinez* Report is used to determine whether a prisoner has a meritorious claim, it cannot be used to resolve disputed issues of fact. *Doc. 95.* Likewise, summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. . . . A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Sports Unlimited, Inc. v. Lankford Enter., Inc.,* 275 F.3d 996, 999 (10th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence" that would justify sending the case to a jury. *Williams v. Rice*, 983 F.2d 177, 179 (10th Cir. 1993) (citing *Anderson* 477 U.S. at 249-52).

# III.  Factual Background

DACDC policy requires that employees:  "respect and protect the civil and legal rights of all detainees," *Martinez Report,* Exh. A-11 (§ 1.a.); "serve each situation with appropriate concern for the detainee's welfare and with no purpose of personal gain," *id.,* (§ 1.b); "not discriminate against any detainee . . . on the basis of race," *id.,* Exh. A-13 (§ 2.g.); and protect detainees "from personal abuse, personal injury, [or] corporal punishment," *id.,* Exh. A-14 (policy).  To protect inmates from abuse, detention officers are specifically required to use the "lease (sic) amount of external management necessary to secure order," in the event physical force is necessary.  *Id.,* Exh. A-14 (¶ 1).

To that end, among other things, detention officers receive initial and/or advanced or refresher courses in "disturbance control techniques," "defensive tactics," the "Mandt System," "use of force," and "anger management."  *See id.,* Exhs. A1-A10; *Steele Aff.,* ¶¶ 8, 11.  The Mandt System "is a training program designed, in part, to teach detention officers to effectively and safely deal with both non-aggressive and aggressive inmates by using a system of graded alternatives designed to protect all individuals from injury."  *Steele Aff.,* ¶ 9.

The Detention Center has a detailed written policy governing the use of force by detention officers.  The first section outlines the policy:

> All Detention Officers are required to receive training regarding use of force and restraints.
>
> The level of force to be used is no more than is reasonably necessary under the circumstances.  The use of physical force is permissible only when it is necessary to maintain control and security on the premises of the Detention facility, including, but not limited to, instances of self defense, defense of others, protection of security of the Detention Center and the prevention of escape.

> A written report shall be prepared following each use of physical force and/or restraint and will be submitted through the chain of command to the Captain of Operations.

*Martinez Report,* Exh. A-8.

A detention officer who uses force (or the Shift Supervisor, if the officer is unable) must prepare a preliminary report accurately and precisely describing the incident and the reason for employing the level of force used. The report is to be forwarded to the Lieutenant of Operations. *Id.* (Procedure, § 2).

Another section outlines the different levels of force under the Mandt system that are authorized and specifically provides:

> Force, security equipment and restraint equipment are intended to be used only as control measures when absolutely necessary. They are not intended, and ***shall not be used as a means of punishment. All employees will refrain from one-on-one confrontations with detainees that may result in physical confrontation.*** A call for "back-up" may be all that is necessary to manage an unruly detainee.

*Id.,* Exh. A-9 (§ 3, preamble) (emphasis added). There is no dispute that McClure received the initial 200 hours of training, including specific courses in policies and in Mandt, one year before the altercation took place. *See e.g., id.,* Exhs. D-1 to D-34 (training received 2/3/97 - 2/25/97).[1]

While all of the surrounding facts are relevant, the crucial material facts are what happened just before the altercation took place and during the initial stages of the altercation. These facts are entirely in dispute.

---

[1] Later, in 1997, he took a course in evacuation and bomb threats. *Martinez Report,* Exh. D-1. The other courses he took occurred after the incident took place. *Id.* (courses taken on 2/26/98, 5/21/98, and 8/27/98). There is no record that he received anger management training or advanced courses in the use of force.

According to Plaintiff, on February 5, 1998, at approximately 8:30 p.m.,[2] McClure

attacked him without provocation.  His version of the timeline and events are as follows:

- ! Gentry and McClure exchange words over the television incident.[3]

- ! The head count takes place without incident.

- ! After the count is completed, McClure calls Gentry out of his pod.

- ! McClure starts to beat Gentry without any verbal or physical provocation by Gentry.[4]

- ! Gentry tries to get out of a choke hold, so he is struggling when the other officers arrive.  The other officers join in assisting to subdue him.

- ! McClure and others call Gentry a "nigger" several times, presumably during the beating.

- ! McClure injures his hand as a result of punching Gentry in the face.

- ! After the beating, McClure brags about "whopping that big Nigger," and states over loudspeaker he wants to continue the beating.

- ! Licensed Practical Nurse Larry Belter[5] and detention officer Marvin Fielder

---

[2] Earlier pleadings raised the question whether the event took place on the 5th or the 6th, *see e.g., Doc. 95,* and the incident reports submitted with the *Martinez* Report do not resolve the issue because some are dated the 5th and others are dated the 6th. *see Martinez Report,* Exhs. E-19 - E-31.  Earlier I found Plaintiff's complaint timely based on the February 5th date.  *See Doc. 71.*  Therefore, resolution of exactly which date applies is inconsequential for the present purposes, and does not alter my prior timeliness finding.

[3] According to the inmate grievance Gentry filed, after he inquired whether it was lock down time, McClure said "fuck you and get your fucking ass in your cell."  Gentry therefore cursed back, to which McClure replied that he would "take care" of Gentry later.  *Martinez Report,* Exh. E-32.

[4] In his inmate grievance, Gentry claims that when he asked McClure "what up," McClure said put your fucking hand on the wall."  Gentry replied something that is illegible.  *Martinez Report,* Exh. E-32 (looks like "katu").  McClure responded he would hit Gentry if he did not comply and Gentry replied that he would take the U.S. Marshal.  Thereupon, McClure and detention officer Reyes allegedly hit him in the mouth and eyes and choked him to the ground.  *Id.*

[5] Belter is an LPN.  *See Martinez Report,* Exh. E-33.

> tell Gentry that there is a history of brutality against inmates and that high-ranking staff are aware of the problem and do nothing about it.

> **!** McClure offers gifts to inmates in exchange for their testimony that Gentry started the fight.

> **!** McClure threatens Gentry again and harasses him.

> **!** The disciplinary committee finds Plaintiff guilty of profanity towards staff and assault on staff, but did not take any action against him.

Doc. 93, Exh. A (hereinafter "*Plf. Aff. A*" in which Plaintiff "verifies" the allegations in his Complaint if not already verified, which they were not)*; id.,* Exh. B at ¶¶ 12-13 (hereinafter "*Plf. Aff. B*"); *id.,* Exh. C at ¶¶ 5-7, 9 (hereinafter "*Plf. Aff. C*"); *see also Doc. 1,* ¶¶ 9-14; *Martinez Report,* Exh. E-32 (Gentry grievance); *id.,* Exh. E-42 (allegations of McClure's conduct after altercation submitted to disciplinary committee); *id.,* Exh. E-43 (disciplinary committee findings); *Doc. 97* at 21-22; *Doc. 99,* Exh. C, ¶¶ 7-13 (hereinafter "*Plf. Aff. D*").  In short, Plaintiff maintains that he acted in "self-defense to save his life." *Doc. 99* at 14.

On the other hand, McClure's affidavit tracks statements he made in his incident report immediately following the incident.  He claims that Plaintiff's conduct was impeding the head count and escalated from verbal abuse toward McClure to physical aggression.  McClure's version of the timeline and events are as follows:

> **!** From the control room, McClure opens the [cell] doors and turns off the television in preparation for the head count.

> **!** Gentry does not go to his room.  Instead, he presses the buzzer in the day room and asks if they are going to lockdown.

> **!** When McClure replies "yes," Gentry says "why the fuck don't you flash the lights asshole so that we could know what you want."

> **!** When McClure responds that Gentry knows when the doors open he is to

go to lockdown, Gentry becomes upset, continues to curse, and refuses to go to his cell.

! McClure asks detention officer Sanchez to watch the control room and, along with  Officer Reyes, goes to the day room.

! McClure asks Gentry to step outside of the day room "because other inmates did not need to listen to the matter."

! As Gentry walks out into the corridor, he bumps into McClure with his chest.  McClure interprets the bump as purposeful.

! Outside the day room, Gentry becomes verbally abusive again and begins walking toward McClure.

! McClure steps back and asks Gentry to place his hands on the wall.

! Gentry does not comply and McClure makes four other unspecified attempts to get Gentry to comply.

! Gentry begins to walk toward McClure asking McClure to hit him so he could call the U.S. Marshals and sue him.

! Officer Reyes calls Lieutenant Sal Bentancourt for back up.

! Gentry moves toward McClure again and McClure puts his arm out to keep Gentry an arms length away.  Gentry commences swinging, striking McClure lightly in the face twice.

! McClure and Officer Reyes began trying to restrain Gentry and he grabs McClure by the waist, almost knocking him down.

! McClure decides to restrain Gentry and "remove him from [McClure's] body" to keep control.  In so doing, Gentry falls to the ground and refuses to comply.

! The other officers arrive and assist with restraining Gentry and removing him to a cell.

*Doc. 84,* Exh. A (hereinafter "*McClure Aff.*"); *see also Martinez Report,* Exh. E-20-21 (McClure

incident report); *id.,* Exh. E-30–31 (McClure response to Gentry grievance, explaining incident in

more detail).

The two detention officers who observed the altercation from the beginning largely corroborate McClure's version of the facts.  However, the incident report of detention officer Reyes,[6] who was with McClure throughout the confrontation, does not mention that Plaintiff bumped McClure.  *Martinez Report,* Exh. E-28 (Reyes incident report).  In addition, detention officer Sanchez, who observed from the control booth, saw Gentry moving toward officer McClure in a threatening manner, but then Sanchez turned around to get his radio.  When he turned back, Sanchez saw McClure and Reyes struggling with Gentry and then take him to the ground.  *Id.,* Exh. E-24 (Sanchez incident report).  The officers who arrived on the scene near the end of the altercation observed Gentry struggling and cursing while on the floor with various officers trying to handcuff him.  *See id.,* Exh. E-19 (Betancourt incident report to then Lieutenant Cheryl Roach); *id.,* Exh. E-22 (Barnes incident report); *id.,* Exh. E-25 (Fong incident report); *id.,* Exh. E-26 (Frietze incident report); *id.,* Exh. E-27 (Nevarez incident report).

Although a number of the officers' incident reports do not mention injuries sustained by McClure or Plaintiff,[7] the record indicates that both were injured in the brawl.  The evidence supporting the conclusion that McClure was injured in incident is straightforward.  "McClure was bleeding from his right hand, and had two scratches:  one on his forehead and another on the right side of his face."  *Id.,* Exh. E-22 (Barnes incident report).  He was sent to the hospital on the

---

[6]  Plaintiff moves to strike all of the detention officers' incident reports except McClure's as redundant.  *See Doc. 115.*  For the reasons stated in Defendants' response, this request is without merit.  *See Doc. 122.*

[7]  *See e.g., Martinez Report,* Exh. E-22 (Barnes' first incident report); *id.,* Exh. E-25 (Fong incident report); *id.,* Exh. E-26 (Frietze incident report); *id.,* Exh. E-27 (Nevarez incident report); *id.,* Exh. E-28 (Reyes incident report).

recommendation of Medical Technician Roger Terrazas, to treat "an injury that was sustained to his right hand." *Id.,* Exh. E-19 (Betancourt incident report); *see also Betancourt Aff.,* ¶ 22.

The evidence regarding Gentry's injuries is less than straightforward.  For example, some of the officers' incident reports mention that Gentry was seen by a medical technician but give the impression that little was wrong, at least immediately after the fight.  McClure's incident report actually indicates that Plaintiff stated he did not want medical attention.  *See Martinez Report,* Exh. E-21 (McClure incident report); *id.,* Exh. E-27 (Nevarez incident report, does not mention any injuries but does say that Gentry was examined by medical technician); *id.,* Exh. E-28 (Reyes incident report) (does not mention injuries but does say medical "cleared" Gentry).  Officer Barnes wrote two incident reports -  the second written after he was asked to respond to the cell where Gentry was being held and receiving medical attention.  This report states that medical staff noted that inmate was not injured or bleeding, *id.,* Exh. E -23, and somewhat contradicts Terrazas' report that "[u]pon examing (sic) Mr. Gentry's mouth there was blood around his lips. On further exam of the inside of his mouth there was no blood or any problem that were noticiable (sic) to me.  Inmate had no other injuries," *id.,* Exh. E-29.

Regardless of what officers and others observed immediately after the fracas, injuries to Plaintiff were noted the next day.  Plaintiff submitted the affidavit of Fielder, who saw Plaintiff the day after the fight.  Fielder's affidavit states that he observed "obvious bruises on [Gentry's] face, his right eye was bloodshot and puffy, he had residue blood in his mouth.  Mr. Gentry pointed out that at least two of his teeth had been loosen (sic) [and] stated that his neck was hurting him

where Mr. McClure had choked him." *Doc. 102,* attachment, ¶ 6 (hereinafter "*Fielder Aff.*").[8]

Moreover, a nurse and physician also observed Plaintiff the day after the fight and the doctor diagnosed Plaintiff with "multiple contusions (facial) and cervical sprain." *Martinez Report,* Exh. E-33. The doctor prescribed 250 milligrams of penicillin four times a day for ten days and 600 milligrams of ibuprofen every six hours as needed for discomfort. *Id.* Plaintiff took both medications until the 20th of February 1998, or approximately two weeks after the fight. *See id.,* Exh. E-35. The doctor also prescribed a dental consult for Plaintiff's complaint of loosened teeth and an optometry consult for his complaint of eye pain. *Id.,* Exh. E-33.

On February 11, 1998, Plaintiff was seen by Dr. Richard W. Lazaro for his eyes. *Id.,* Exh. E-37. The detention center nurse's note for the consult lists "facial contusions (fight)." *Id.,* Exh. E-36. Dr. Lazaro's notes state:

> Patient has a history of an eye problem in the right eye, not sure exactly what. Anterior segment with ***subconjunctival hemorr[h]age*[9]** in the right eye, pupils normal. No Marcus Gunn

---

[8] When Gentry initially filed objections to the *Martinez* Report, he attached an affidavit signed by himself relating a telephone conversation he had with Fielder on September 6, 2002, and indicated Fielder was going to prepare an affidavit. *See Doc. 99,* Exh. A. Defendants moved to strike Plaintiff's affidavit as hearsay, since it was based on a telephone conversation Plaintiff had with Fielder. *See Doc. 103.* However, Plaintiff subsequently provided Fielder's own affidavit as a supplement to his objections. *See Doc. 102,* attachment. Therefore, Defendants now ask the court to strike Plaintiff's version as duplicative. *See Doc. 112,* ¶ 7. I will do so to keep the record clear. Defendants further move to strike certain portions of Fielder's affidavit for various reasons. *See Doc. 112* at n.1; *Doc. 104,* at 6-7. The above paragraph concerning what Fielder observed as injuries is not among the them.

[9] Subconjunctival hemorrhage: A very common cause of a painless bloody eye usually first noticed by somebody else or by the person with it when they look in the mirror. The bleeding results from a break in a small blood vessel in the sclera, the white of the eye. . . .

A subconjunctival hemorrhage can occur with heavy lifting, coughing, sneezing, vomiting or for no apparent reason. It looks bad and may be frightening but is not dangerous and leaves no residual change in vision.

> by the optic nerve looks a little pale in the right eye.  Suggestive of optic atrophy.  Peripheral retina shows no evidence of any acute injury.  Impression is ***optic atrophy,***[10] right eye.  Etiology probably from the ***optic neuritis.***[11]  Should be checked for glasses when he comes out of incarceration.

*Id.,* Exh. E-38 (emphasis added).

On March 16, 1998, Plaintiff was taken to the dentist for an emergency examination.  Id., Exh. E-46.  The dentist diagnosed "perio hopeless – simple ext" and one tooth was removed.  *Id.,* Exh. E-45.

## III.  Legal Analysis

As a pretrial detainee at the time the incidents took place, Plaintiff's constitutional protections flow from the Due Process Clause.  Nevertheless, his excessive use of force and denial of medical care claims are analyzed under Eighth Amendment standards.  *See Doc. 71* at 10 & n.10; *see also e.g., Barrie v. Grand County,* 119 F.3d 862, 867 (10th Cir. 1997) ("pretrial

---

> There is no discharge from the eye.  The redness may  turn brown or green and everything returns to normal within 3 weeks as the blood is absorbed.
>
> Subconjunctival hemorrhage does not require treatment. Any features not characteristic of subconjunctival hemorrhage (such as pain in the eye, a change in vision, or failure to clear  up within 3 weeks, or recurrent hemorrhage) are reason to see a doctor.

www.medicinenet.com (dictionary)

[10]    Atrophy: Wasting away or diminution. Muscle atrophy is wasting of muscle, decrease in  muscle mass.
A nerve can also show atrophy. For example, atrophy of the optic nerve diminishes vision.

www.medicinenet.com (dictionary).

[11]  Steadman's Medical Dictionary (25th ed.) defines optic neuritis as "inflammation of the optic nerve."

detainees . . . are entitled to the same degree of protection regarding medical attention . . . .

Thus, [an] inadequate medical attention claim must be judged against the 'deliberate indifference

to serious medical needs' test").

### A. Delay In Medical Care Claim In Unexhausted & Without Merit

Upon entering prison in November 1997, Plaintiff signed a form indicating that he had

"eye trouble" and "severe tooth or gum trouble."  *Doc. 83,* attachment (clear copy of *Martinez*

Report, Exh. E-7).  Despite that document, Gentry asserts that when he "entered Dona Ana, his

teeth were not a problem, and he so indicated.  However he had a history relative to two other

teeth not the teeth damaged by McClure."  *Doc. 97* at 24.

Plaintiff attributes his eye and teeth problems to McClure, and complains of the short

delay in seeing the eye doctor and the long delay in seeing the dentist after the examining

physician so recommended.

> It is true that [Gentry] was seen by a nurse and doctor after he was beaten,
> nevertheless both the nurse and doctor noted significant injuries to Plaintiff
> Gentry.  Despite the orders of the doctor, Defendants delayed in allowing
> Plaintiff to be treated by medical personnel.  Moreover, Defendants denied
> Plaintiff dental treatment for almost two months, even though Plaintiff's
> mouth was damaged and at least two teeth loosen (sic).

*Id.* at 23; *see also id.* at 16.  He seeks to hold Steele, and apparently the Board, liable based on an

alleged "clear pattern of failure to provide proper medical care to inmates, " *id.* at 17, asserting

that "Steele and his co-Defendants historically deliberately ignored the medical needs of the

inmates in their care," *id.* at 24; *see also id.* at 26.  Steele and the Board argue, among other

things, that Plaintiff did not file a grievance on the medical care claim and that it is without merit.

I agree.

The medical care claim was not raised in Plaintiff's complaint.  *See Doc. 71* at 2 (first set of proposed findings summarizing allegations in Complaint).  At the earliest, it was raised in the affidavit Plaintiff attached to a surreply to Defendants' prior motion to dismiss.  *See Doc. 40,* attachment (¶ 14).  When I issued my earlier recommendation, I was under the impression from Plaintiff that he did not file a grievance because he was unaware of the availability of the procedures.  *See Doc. 71* at 7-8.  Plaintiff now asserts that he did not understand the phrase "exhaust administrative remedies" and essentially concedes, in light of the materials submitted with the *Martinez* Report, that he in fact was aware of the procedures and availed himself of them to complain of the beating.  *See Plf. Aff. D,* ¶ 5; *Doc. 97* at 10-16; *Martinez Report,* Exh. E-32.

In one pleading, Plaintiff states that he "complained of dental pain for over six weeks, before Defendants permitted him to be seen by a dentist as a result Plaintiff lost two teeth," *Doc. 97* at 23.  However, nowhere in his inmate and medical files does it show that he complained of the delay in medical care, much less filed a grievance concerning the delay.  *See Martinez Report,* Exh. E1 - E-53.

Under § 1997e, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  When one claim is exhausted and another is not, it is not yet clear whether the entire complaint should be dismissed.[12]  Additionally, it is not yet clear to what extent the

---

[12]  *See, e.g. Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000) ("When multiple prison condition claims have been joined, . . . the plain language of  § 1997e(a) requires that all available prison grievance remedies must be exhausted as to all of the claims."); *Hartsfield v. Vider*, 199 F.3d 305, 309 (6th Cir. 1999) (addressing merits of unexhausted claims); *Lee v. Suthers*, 2002 WL 31492632 (10th Cir. 11/8/02) (affirming dismissal of exhausted claims on the merits and of unexhausted claims); *Lowe v. Sockey,* 36

14

administrative proceedings must be available to require exhaustion of an unexhausted claim.[13]  On

the other hand, the claim is entirely without merit and should be dismissed.  *See Fleming v.*

*Uphoff,* 219 F.3d 389, 2000 WL 374295 (10th Cir. 4/12/00) (affirming district court's decision

dismissing claim rather than addressing exhaustion).

    A delay in medical or dental care can constitute an Eighth Amendment violation.  To

prevail, the prisoner must show three things:  (1) the medical need was objectively "sufficiently

serious," that is, "'has been diagnosed by a physician as mandating treatment or . . . is so obvious

that even a lay person would easily recognize the necessity for a doctor's attention,'" *Oxendine v.*

*Kaplan,* 241 F.2d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224

(10th Cir. 1999); (2) the delay in medical care "'resulted in substantial harm;'" *id.* (quoting

*Sealock v. Colorado,* 218 F.3d 1205, 1210 (10th Cir. 2000)); and (3) Defendants "knew he faced a

substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate

it," *id.* (internal quotations and citations omitted).  Gentry's allegations fail at each element.

    Neither Plaintiff's eye condition nor his tooth pain were sufficiently serious.  The first

doctor who examined Plaintiff after the fight prescribed ibuprofen and penicillin for his

contusions.  The eye doctor who subsequently examined Plaintiff found that he could wait for

_____

Fed. Appx. 353, 2002 WL 491731 (10th Cir. 4/2/02) (reversing dismissal of unexhausted claim as
frivolous and affirming dismissal of exhausted claim as frivolous).

    [13]  *Compare Hopkins v. Addison,* 36 Fed. Appx. 367, 2002 WL 1004062 (10th Cir. 5/17/02)
(holding that exhaustion requirement applies to inmates released on parole after suit was originally filed),
*cert. denied,* 123 S.Ct. 338 (10/7/02), *with later decision in Jernigan v. Stuchell,* 304 F.3d 1030, 1032
(10th Cir. 2002) (agreeing that "failure to respond to a grievance within the time limits contained in the
grievance policy renders and administrative remedy unavailable" and other circuit decisions cited therein
discussing unavailability, but finding facts of case at bar distinguishable).  My first set of proposed
findings questioned whether there is any available administrative remedy for Plaintiff to pursue, given that
he was transferred to federal custody after the incident.  *See Doc. 71* at 9.

glasses until he was discharged from prison.  Although dental problems can result in serious conditions, they are different in character from manifestations of more dangerous illnesses or trauma such as heart attack symptoms.  Pain associated with a toothache is not necessarily an objectively serious condition.[14]  "[N]ot every twinge of pain suffered as the result of delay in medical care is actionable."  *Sealock,* 218 F.2d at 1210 (severe chest pain, accompanied by other symptoms indicative of heart attack meets objective test); *see also Oxendine,* 241 F.3d at 1278 (blackened and necrified tissue of reattached severed finger objectively serious).  Indeed, nothing in the record shows that Plaintiff asked for more pain medication after his initial course of treatment.

Even assuming that Plaintiff meets the serious medical need prong, he fails to meet the other two.  A delay in medical care results in "substantial harm" when the outcome is "a lifelong handicap or a permanent loss," "life-threatening situations" such as heart attacks or, "instances in which it is apparent that delay would exacerbate the prisoner's medical problems."  *E.g., McBride v. Deer,* 240 F.3d 1287, 1289-90 (internal quotations and citations omitted) (delay of one month to treat pain associated with surgery for gunshot wound to leg resulted in prisoner losing "full function" of the leg).  None of those situations are alleged or present here.  Plaintiff's gum problems were preexisting.  When he was taken to the dentist for an emergency exam, his dental

---

[14] *See Harrison v. Barkley,* 219 F.3d 132, 137 (7th Cir. 2000) ("Ordinarily, a tooth cavity is not a serious medical condition, but that is at least in part because a cavity is so easily treatable.  Absent intense pain or other exigency, the treatment of a cavity (in or out of prison) can safely be delayed by the dentist's schedule or the patient's dread or neglect, can be subject to triage or the management of care, can be mitigated or repaired temporarily, and can be coordinated with other related conditions that need to be treated together.  Nevertheless, a tooth cavity is a degenerative condition, and if it is left untreated indefinitely, it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction.").

pain from the teeth allegedly loosened by McClure ceased with the extraction of one of his teeth.

Moreover, the dental pain of which Plaintiff complains is less serious, and certainly no greater

than, the allegations made by the prisoner in *Grant v. Bernalillo County Detention Center,* CIV

98-633 LH/LFG, where the complaint was dismissed *sua sponte* under FED. R. CIV. P. 12(b)(6)

and affirmed on appeal[15] or in *Carroll v. Newton,* CIV 00-99 MV/KBM where a similar delay in

dental care was dismissed as without merit following a *Martinez* Report and affirmed on appeal.[16]

Finally, there is no allegation whatsoever that Steele or McClure were informed about the

referral for a dentist consult or that they were responsible for any delay in scheduling him to see

the dentist.  Regardless, because Plaintiff's claim fails on either of the first two prongs, he fails to

state a constitutional violation and, absent a constitutional violation, there can be no supervisory

or municipal liability.  *E.g., Monroe v. Pueblo Police Dept.,* 30 Fed.Appx. 778, 781 2002 WL

---

[15]  In *Grant,* the prisoner complained he fell and hurt his back in the shower but officials refused to take him for medical care until after the prisoner persistently complained.  The Court noted that:

> we have rejected a prisoner's claim that requiring him to wait one to two years for an operation constituted cruel and unusual punishment under the Eighth Amendment, reasoning that he had failed to establish that the delay would cause further damage to his leg.  *See White v. State of Colo.,* 82 F.3d 364, 366 (10th Cir. 1996).
>
> Applying these principles to Mr. Grant's allegations, we agree with the district court that he has failed to state an Eighth Amendment claim.  With regard to his first fall, Mr. Grant alleges only that he was 'in bad pain' and that, when he was taken to a doctor '[a]fter some time,' he was informed that he 'had a pool of blood and some spin [sic] fluid' . . . .  The potential seriousness of these injuries causes us some concern.  However, Mr. Grant has failed to make any specific allegations as to the length of the delay in providing medical care, and he has failed to allege that this unspecified delay resulted in substantial harm.

1999 WL 157415 at *3 (10th Cir. 1999) (unpublished).

[16]  *Carroll v. Newton,* CIV 00-99 MV/KBM (*Docs. 66, 68*), *aff'd Carroll v. Newton,* 44 Fed.Appx. 455, 2002 WL 1980672 (10th Cir. 8/29/02).

126994 *3 (10th Cir. 2/1/02) (citing *Trigalet v. City of Tulsa,* 239 F.3d 1150, 1155-56 (10th Cir.

2001) (even if city's police policies, training, and supervision are unconstitutional, city cannot be

held liable under § 1983 if the officers did not actually commit a constitutional violation); *Myers*

*v. Okla. County Bd. of County Com'rs,* 151 F.3d 1313, 1316 (10th Cir. 1998) (holding that a

municipality cannot be liable under § 1983 for its employees' actions if the employees committed

no constitutional violation).

### B.  *Plaintiff's Complaint Does Not Raise An Independent First Amendment Claim*

When McClure shut off the television to signal the inmates to return to their cells for a

head count, Plaintiff complained about McClure's choice of method, even though turning off the

television is the established protocol according to the inmate rules.[17]  Plaintiff's Complaint recites

the First Amendment as one of the bases for recovery, but throughout his pleadings he does not

pursue an independent First Amendment claim.

Nor does it appear that he could.  This is not a situation where a prisoner was punished in

---

[17]     Headcounts are conducted at various times during each shift.  Whenever
headcount is called, televisions are to be turned off and all inmates are to
immediately go to their cells.  Inmates will stand in front of or go into
their cell at the direction of the officer conducting the count.  Talking to or
otherwise distracting the Officers conducting the headcount is a violation
of facility rules.

*Martinez Report,* Exh. A-28 (¶ 3).

retaliation for giving testimony[18] or filing a grievance[19] or other such recognized limited First

Amendment free speech right that prisoners retain.  It is questionable whether a matter of purely

private concern, such as what Plaintiff was expressing, can give rise to an independent First

Amendment claim.  At least one circuit appears to say it does not.[20]

---

[18] *E.g., Burton v. Livingston,* 791 F.2d 97, 100-01 & n.2 (8th Cir. 1986) (allegation that guard drew weapon, made racial epithets and threatened to shoot black prisoner in the back for giving testimony against another guard analyzed as Due Process, Equal Protection, and First Amendment claim; in footnote court noted that "no relief that he could obtain by prevailing on an Eighth Amendment theory would be different from or additional to that obtainable under his other approaches.").

[19] *E.g., Purkey v. Green,* 28 Fed.Appx. 736, 745-46 (10th Cir. 2001) ("Because a prisoner must first file a grievance in order to ultimately gain access to courts to state a claim for relief under 42 U.S.C. § 1997e, then punishing him for actually filing grievances by placing him in disciplinary segregation would state a claim for a both an access to courts and a First Amendment violation," citing *Smith v. Maschner,* 899 F.2d 940, 947 (10th Cir. 1990)).

[20]   We also agree with the district court that this lawsuit involves no implications of free speech rights.  Although Brookins argues that the prison officials retaliated against him for exercising his right to free speech,  he has not demonstrated that the speech contained in his letter rose to the level of protected speech.  Brookins did not write the letter to inform the prison officials about a prison issue that was a matter of public interest or concern.  The letter only dealt with a matter personal to Sanders.

*Brookins v. Kolb,* 990 F.2d 308, 313 (7th Cir. 1993).

The Sixth Circuit does not read *Brookins* broadly.

That inmates have a well-established constitutional right to access the courts, based in part on the First Amendment, is clear.  Less clear are the contours of free speech rights in the prison setting.  No circuit has held that the *Connick* public concern limitation applies to prisoners' speech; conversely, no circuit has held that it does not.  The defendants' reliance on *Brookins* . . . for the proposition is misplaced.  The prisoner in that case was disciplined for misusing his authority and violating the rules of the Paralegal Base Committee ("PBC") on which he sat. The PBC assisted inmates with their legal research and documents, and Brookins sent a letter on PBC letterhead to prison officials recommending the use of a lie-detector test in another inmate's case and stating that the PBC would pay for the use.  He was removed from the committee for violating the

In any event, Plaintiff theorizes that McClure became angered by his comment and beat him as a result.  In one of his affidavits, for example, he states:

> McClure called me out of the pod after count was completed for the sole purpose of beating me with other officers which he did.  Whatever words were exchanged between us before the count did not authorize his unprovoked beating.  As our verbal discussion had ended before count, **there was no cause for him to call me out except to express his personal anger at me by beating me.**

*Plf. Aff. A, ¶* 3; *see also Doc. 97* at 22 ("Gentry did not create any problem at the count following his verbal discussion with McClure, thus Plaintiff's beating was pure punishment for his right to speak.").  As such, the comment is part of and inextricably linked to Plaintiff's excessive use of force claim.  Under those circumstances, I find that Plaintiff's First Amendment claim is subsumed by his excessive force claim.[21]

---

> rules requiring pre-approval of all committee correspondence and of all fund requests. . . . Although the court mentioned that the letter was not on a matter of public concern, *Brookins* is more appropriately characterized as a prison employee in this situation, representing the committee in an inmate grievance proceeding. It is a step removed from his speech as an inmate. . . .
>
> Because it is not at issue in this case, we make no determination about the appropriateness of explicitly applying the public concern limitation to speech by prisoners, whose free speech rights are uncontrovertedly limited by virtue of their incarceration. We hold only that there is no authority for subjecting a prisoner's constitutional right to access the courts, an aspect of the First Amendment right to petition the government for redress of grievances, to the public concern limitation described in *Connick v. Myers.*

*Thaddeus-X v. Blatter,* 175 F.3d 378, 391 (6th Cir. 1999).

[21]   *C.f., Whitley v. Albers,* 475 U.S. 312, 327 (1986) (We think the Eighth Amendment . . . serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified."); *Clemmons v. Bohannon,* 918 F.2d 858, 869 (10th Cir. 1990) (prisoner's claim that involuntary exposure to ETS violated his due process rights under Fourteenth Amendment was effectively subsumed within his Eighth Amendment claim), *vacated on other grounds,* 956 F.2d 1523 (10th Cir. 1992) (en banc); *Shull v. Borough of Wilson,* 1993

### C. Disputed Facts Prevent Dismissal of Excessive Use of Force Claim Against Defendant McClure In His Individual Capacity

Excessive use of force claims are a species of Eighth Amendment violations, but they are not analyzed under the deliberate indifference standard. *E.g., Farmer v. Brennan,* 511 U.S. 825, 835 (1994); *Hudson v. McMillian,* 503 U.S. 1, 6-7 (1992); *Despain v. Uphoff,* 264 F.3d 965, 978 (10th Cir. 2001). Instead, such claims are analyzed under the standard announced in *Whitley v. Albers,* where the fact finder must determine whether McClure acted "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." 475 U.S. 312, 320-21 (1986).

The *Whitley* standard focuses on whether the force was justified. To reach the conclusion whether McClure acted maliciously or not requires balancing "the need for application of force with the amount of force used." *Mitchell v. Maynard,* 80 F.3d 1433, 1440 (10th Cir. 1996). If there is no legitimate penological purpose that can be inferred from McClure's alleged conduct, then his "conduct itself constitutes sufficient evidence that force was used maliciously" under *Whitley. Giron v. Corrections Corp. of America,* 191 F.3d 1281, 1290 (10th Cir. 1999) (internal quotations omitted); *see also Despain,* 264 F.3d at 978 (same).

In *Hudson,* the Supreme Court identified the factors *Whitley* posed, but held that significant injury is not a prerequisite to recover for excessive use of force:

---

WL 29142 n.1 (E.D. Pa. 1993) ("We treat plaintiff's claim . . . as a due process claim--the defendants violated his substantive due process rights by making an arbitrary and capricious decision based on his union activities, and violated his procedural due process rights by circumventing the civil service procedures. Such a claim subsumes any first amendment retaliation argument since, as we noted, the civil service protections guard against, and provide state remedies for, any proceedings contrary to Article (j) regardless of motivation. We, thus, do not address plaintiff's first amendment arguments separate and apart from the due process claim.").

> the extent of injury suffered by an inmate is one factor that may suggest
> "whether the use of force could plausibly have been thought necessary" in a
> particular situation, "or instead evinced such wantonness with respect to
> the unjustified infliction of harm as is tantamount to a knowing willingness
> that it occur." [*Whitley,*] 475 U.S., at 321.  In determining whether the use
> of force was wanton and unnecessary, it may also be proper to evaluate the
> need for application of force, the relationship between that need and the
> amount of force used, the threat "reasonably perceived by the responsible
> officials," and "any efforts made to temper the severity of a forceful
> response."  *Ibid.*  The absence of serious injury is therefore relevant to the
> Eighth Amendment inquiry, but does not end it.

*Hudson,* 503 U.S. at 9.  Plaintiff's allegations of injury, discussed above, if found to have resulted

from the altercation, are sufficient to state a claim for excessive use of force.  *See e.g., Hudson,*

503 U.S. 10 (bruises, swelling, loosened teeth and cracked dental plate); *Despain,* 264 F.3d at

978 (burning eyes and lung congestion as result of pepper spray allegedly administered as a joke);

*Escobar v. Zavaras,* 1998 WL 31403 (10th Cir. 1998) (slamming food tray on inmate's little finger

and breaking it).

      The facts underlying the incident are in dispute, and if Plaintiff's version of the facts is

credited, he states a claim under the *Whitley* standard.  Therefore, the individual claim against

McClure for excessive use of force is not subject to dismissal based on the *Martinez* Report.

### D.  Supervisory Claims

### 1.  Official Capacity Claims against Individual Defendants should be Dismissed

      By suing Steele in his official capacity, Plaintiff is simply duplicating his municipal liability

claim against the Board.  As such, a separate official capacity claim against Steele is unnecessary

and can be dismissed, although not precisely on the basis argued by Defendants.  *E.g., Hafer v.*

*Melo,* 502 U.S. 21, 25 (1991); *see also Doc.* 107 at 2-3.  The same is true for Plaintiff's suit

against McClure in his official capacity.

### 2.  Suit Against Steele in his Individual Capacity[22]

Neither Steele individually nor the Board can be held liable under § 1983 simply because one of their subordinates violates a prisoners' constitutional rights.  Instead, there must be an affirmative link between their conduct and the constitutional violation.  Otherwise, liability would be imposed on a vicarious or *respondeat superior* basis, which is prohibited.  *See e.g., Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978) (municipal liability); *Mitchell v. Maynard,* 80 F.3d 1433, 1440-41 (10th Cir. 1996) (supervisors, citing *Rizzo v. Goode,* 423 U.S. 362, 376 (1976)).

For Steele, a link must be shown that Steele somehow participated in the beating, for example, either by authorizing or directing it, participating in it, or failing to supervise.  *E.g., Holland v. Harrington,* 268 F.3d 1179, 1187 (10th Cir. 2001), *cert. denied,* 122 S.Ct. 1914 (2002); *Worrell v. Henry,* 219 F.3d 1197, 1214 (10th Cir. 2000), *cert. denied,* 533 U.S. 916 (2001); *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir. 1990), *cert. denied,* 499 U.S. 976 (1991).  By Plaintiff's own version of the facts, Steele had no personal or direct involvement in the beating – Steele did not instruct McClure or detention officers to beat Plaintiff or any other inmate, nor did he stand by while it happened.

Steele was the Administrator of the Doña Ana County Detention Center from December 1992 until he retired in December 1998.  *Steele Aff.,* ¶ 1.  Steele's affidavit states that prior to the McClure/Gentry incident, he was not aware of any complaints against McClure specifically, and

---

[22] Steele has not moved for dismissal based on qualified immunity for the failure to supervise claim, *see Doc. 80,* and the parties are in accord that punitive damages are not available against the municipality.  *See Doc. 97* at 27-29.

this assertion is uncontradicted. *Id.,* ¶¶ 6-7.[23]  This lack of personal participation and lack of

deliberate indifference to a known risk constitutes grounds to dismiss the claim against Steele in

his individual capacity.[24]

---

[23]  Indeed, Fielder's affidavit states that even he "became aware that McClure had beaten [other inmates] months ***after*** he assaulted Mr. Gentry."  *Fielder Aff.,* ¶ 12 (emphasis added).  Defendants move to strike this and other paragraphs from Fielder's affidavit because "awareness" does not supply the requisite personal knowledge necessary for affidavits under FED. R. CIV. P. 56(e).  *See Doc. 107* at 5-6; *see also supra,* note 8.  Generally, that is true.  Affidavits based on the "best of one's knowledge," "personal awareness," or "information and belief" are not sufficient.  *See Tavery v. United States,*  32 F.3d 1423, 1427 n.4 (10th Cir. 1994); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 56.14.[1][c] (3d ed. 2002) (and cases cited therein).  However, personal knowledge "does not require contemporaneous knowledge" and can be inferred from the content of the affidavit.  *Id.*  Immediately following the assertion that he learned McClure later beat other inmates, Fielder states that he "confronted Mr. McClure about that second beating and he thought it was funny.  I did not.  I reported his conduct to my superiors."  *Fielder Aff.,* ¶ 13.  Defendants do not move to strike the subsequent paragraph and in context it demonstrates that Fielder's first assertion went beyond repeating something he had overheard.

Similarly, the other paragraph Defendants move to strike asserts that Fielder "became aware of other incidents wherein officers would assault or hurt inmates for no cause" not based on personal knowledge, but the paragraph goes on to state that Fielder "***know[s]*** that these incidents were made known to our superiors but they took no action."  *Id.,* ¶ 14 (emphasis added).  Again in context, this assertion is also not subject to being stricken.

The final paragraph Defendants seek to strike is where Fielder relates that he told Plaintiff he was smart to not put up a fight because the "officers would have helped each other out in that situation.  That's the rules."  Although the statement does not specifically say 'personal knowledge' that deficiency is not fatal.  MOORES, *supra,* ¶ 56.14.[1][c](Rule 56 "does not mandate that the affidavit ***state*** that it is based on personal knowledge") (emphasis original).  Fielder's status as a fellow detention officer supplies his personal knowledge about what customary unwritten "rules" he and/or other detention officers followed in use of force tactics.

Plaintiff moves to strike Defendants' assertion that Fielder was fired and subsequently incarcerated, believing that Defendants are referring to Fielder's brother.  *See Doc. 115.*  Defendants stand by their assertions in their response.  *See Doc. 122* at 4.  I will not inject myself into the parties quabbles over credibility issues since, as Defendants correctly note in their response, that is not the function of this court given the posture in which the case stands.  Therefore, Plaintiff's motion is denied.

[24]  *But see Meade v. Grubbs*, in which the Tenth Circuit held that an Oklahoma jail supervisor could be held liable in his individual capacity for a failure to supervise based upon a breach of supervision duty "imposed by state or local law which caused the constitutional violation."  The *Meade* court reasoned that "*[u]nder Oklahoma law*, a sheriff is responsible for the proper management of the jail in his county and the conduct of his deputies. . . . As a result, a sheriff is accountable in a § 1983 action whenever a sheriff, in a position of responsibility, *knew or should have known* of the misconduct, and yet failed to prevent future harm. . . ."  *Meade*, 841 F.2d 1512, 1528 (10th Cir. 1988) (internal quotations and citations omitted; emphasis added).

### 3.  Municipal and Supervisory Liability for Failure to Train or Supervise

"[A] governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation, . . . thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law. . . ." *Kentucky v. Graham,* 473 U.S. 159, 166-67 (1985) (citations and internal quotations omitted); *see also Mitchell,* 80 F.3d at 1441; *Grimsley v. MacKay,* 93 F.3d 676, 679-80 (10th Cir. 1996); *Bennett v. Passic,* 545 F.2d 1260, 1262-63 (10th Cir. 1976).  For the Board to be liable, Plaintiff must show the link by "(1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood,* 81 F.3d 988, 993-94 (10th Cir. 1996) (citing *City of Canton v. Harris,* 489 U.S. 378, 385 (1989) and *Hinton v. City of Elwood,* 997 F.2d 774, 782 (10th Cir. 1993)).  In other words, to satisfy this burden, Plaintiff "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged. [He] must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown,* 520 U.S. at 404.

One such theory is to allege a inadequate training or supervision.  Plaintiff's conspiracy claim is related to that theory, but is utterly conclusory and should be dismissed.[25]  This case does not present the situation where a municipality fails to train on a particular subject that in turn is the basis for the constitutional deprivation.  *E.g, Brown v. Gray,* 227 F.3d 1278 (10th Cir. 2000)

---

[25]  To state a valid § 1983 conspiracy claim, "a plaintiff must allege *specific* facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kansas Board of Regents,* 159 F.3d 504, 533 (10th Cir. 1998) (emphasis added).  The conspiracy claim likewise fails to the extent it is based on § 1983(5).  *See Dixon v. City of Lawton,* 898 F.3d 1443, 1447 (10th Cir. 1990).

(off-duty officer and motorist "exchanged insulting hand gestures" and thereafter officer shot motorist, but city's "always armed/always on duty" policy and training program did not distinguish between appropriate conduct while on duty vs. off duty); *see also Daskalea v. District of Columbia,* 227 F.3d 443, 442 (D.C. Cir. 2000) ("a 'paper' policy cannot insulate a municipality from liability where there is evidence, as there was here, that the municipality was deliberately indifferent to the policy's violation").  Here the policies flatly ***prohibit*** the conduct of which McClure is accused and provide for training including the proper use of force.  The issue lies in McClure allegedly ignoring the policies and his training altogether.

Plaintiff maintains that Steele and the Board are liable for McClure's conduct, not because they had any advance reason to suspect McClure would act as he did with Gentry, but because they had notice of a history of unconstitutional conduct by detention officers in general as evidenced by newspaper articles and numerous prior lawsuits naming the Board/county and/or Steele as defendants.  Plaintiff therefore contends that there is an informal policy/custom of inaction and failing to supervise/discipline detention center employees, despite prior notice that employees were ignoring the written policy and their training.[26]

------

[26]  In Plaintiff's own words:

Plaintiff has stated under oath that two of the officers employed by Dona Ana County Detention Center advised him that there was a history of unconstitutional violations by Defendants and it was common knowledge by the Defendants in this case.  Moreover, Plaintiff was advised by Officer Marvin Fielder, that McClure and many of the officers involved in the assault on Plaintiff, would back up each other in whatever was needed to be said in order to cover up their unconstitutional beating of Plaintiff.

Moreover, Plaintiff has pointed to a series of lawsuits against the same Defendants demonstrating that it was common knowledge to all Defendants including Steele and the Board of Commissioners, the Defendants frequently beat or raped individual inmates throughout the tenure of office of Steele and the Board. In his affidavit, Steele claimed to have no present knowledge of the Plaintiff's incident however this statement is merely an

In one regard, when the theory of recovery rests on allegations of inaction in the face of widespread abuse of a written policy, the inquiry is essentially the same regardless of whether the theory is cast as a failure to train or as an informal policy/"custom" case. The standard is "rigorous" where, as here, the municipality's written policy is itself legal and does not authorize an unjustified and excessive use of force. *See Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405 (1997) (5-4 decision). "A showing of simple or even heightened negligence will not suffice." *Id.* at 407.

Second, proof of notice is key to sustaining the claim:

> If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they

---

attempt at selected memory and is not evidence or testimony as to whether or not he was involved in a conspiracy to cover-up serious misconduct throughout the institution.

. . . If a violation cannot be considered as official policy of a municipality it can still be held liable if the practice is so permanent and well[-]settled as to constitute a custom or usage with the force of law . . . the actions must be persistent and widespread . . . practices of city officials. The list of cases involving Steele alone meets this criteria, as does the newspaper articles which describe a long history of conspiratorial violations by Defendants.

*Doc. 97* at 6-8; *see also Doc. 98* at 1-2 ("Plaintiff Gentry has submitted evidence by means of court docket entries of this court and newspaper articles that clearly support Plaintiff's contention that during the tenure of Steele and the Board, several inmates were unconstitutionally assaulted by employees of Steele and the Board, and neither took any action to correct these actions. . . . Deliberate indifference exists when the supervisor has actual or constructive notice of a deficiency in the training program and does nothing, or, when the supervisor fails to train an employee in specific skills needed to handle recurring situations that present an obvious potential for constitutional violations."); *id.* at 8 ("Whether or not Steele and the Board formally approved the assaults and rapes, does not diminish the fact that the nonresistance customs of both created the environment leading up to the beating of Plaintiff Gentry. . . . When Steele and the Board failed to control the illegal activities of their subordinates over the years, they became responsible for McClure's unconstitutional activities against Plaintiff."). Defendants note that "Gentry does not directly dispute the adequacy of the training given to detention officers, including Detention Officer McClure. Instead, Gentry raises other lawsuits and other alleged incidents of misconduct which he claims should have put the County and Administrator Steele on notice of the need for more or better training and supervision." *Doc. 104* at 3.

27

> know or should know has failed to prevent tortious conduct by
> employees may establish the conscious disregard for the
> consequence of their action – the 'deliberate indifference' –
> necessary to trigger municipal liability. . . . In addition, the
> existence of a pattern of tortious conduct by inadequately trained
> employees may tend to show that the lack of proper training, rather
> than a one-time negligent administration of the program or factors
> peculiar to the officer involved in a particular incident, is the
> 'moving force' behind the plaintiff's injury.

*Id.* at 407-08 (citations omitted).

By the same token, in an unwritten or "informal" policy or "custom" case, "a municipality

may be held liable when the illegal practice is so permanent and well settled as to constitute a

custom or usage with the force of law." *Camfield v. City of Oklahoma City,* 248 F.3d 1214,

1229 (10th Cir. 2001) (internal quotations and citations omitted); *see also e.g., Goff v. City of*

*Tulsa,* 1999 WL 1246914 (10th Cir. 1999) ("In order to establish a custom, the actions of the

municipal employees must be continuing, persistent and widespread. . . .  In addition, the plaintiff

must show deliberate indifference to or tacit approval of such misconduct by policymaking

officials after notice of such misconduct.") (internal quotations and citations omitted).

The two theories diverge where the proof  rests solely on a single incident by a

nonpolicymaker.[27]  Under those circumstances, while an informal policy/custom theory could not

---

[27]  Ordinarily, to hold the Board liable for a single incident, McClure must have been a "final
policy maker."  In other words, if McClure's alleged decision to beat Plaintiff without provocation in direct
contravention of established policy is to itself constitute a municipal policy, McClure must occupy a
position as a final policy maker.  *E.g., Brown,* 520 U.S. at 407 (assuming without deciding that single
incident of inadequately screening officer's employment application by sheriff with final policymaking
authority, where officer later used excessive force, could state claim but finding evidence insufficient to
establish deliberate indifference); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483-85(1986) (prosecutor
acted as final policymaker in authorizing deputy sheriffs to serve capias on employee of physician at
clinic); *Hollingsworth v. Hill,* 110 F.3d 733, 743-44 (10th Cir. 1997) (sheriff and prosecutor not final
policymakers where allegation was seizing children during service of protective order; on alternative theory
of custom/practice, no custom established); *Jenkins,* 81 F.3d at 994 (single incident actor must be final

by definition be sustained, a failure to train theory could be viable.   "[P]roof of a pattern of constitutional violations is not necessary . . . a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy.  *Brown,* 227 F.3d at 1286 (citing *Allen v. Muskogee,* 119 F.3d 837, 842, 844-45 (10th Cir. 1997) (collecting cases), *cert. denied,* 522 U.S. 1148 (1998)).  It is plain that Plaintiff also wants to rely on the single incident line of cases.  *See Doc. 98* at 12 ("Even though Plaintiff Gentry has proven a series of similar assaults unchecked by Superiors at Dona Ana, it is in compliance with well-settled [] that he need only show one prior example of a single decision by the municipal policy makers to impose liability on the municipality and to meet his burden").

Gentry's proof of notice/pattern/custom rests on four categories of items:

!   Lists of cases generated by this court's database that show more
than 100 lawsuits listing Steele and/or Dona Ana County as parties.
*See Doc. 99,* Exh. B-2 (list of 13 cases dating from 1992 through
the instant case where Frank Steele appears as party); *Doc. 92,*
Exh. A (duplicate of same); *id.,* Exh. B (list of more than 100 cases
where county is named as party).

!   Complaints filed in two of those cases by women inmates who claimed they
were raped.  Both rapes occurred after the Gentry beating, one several months
after and the other a year later.  *See Doc. 99,* Exhs. B-3 - B-14 (complaint
against Terrazas, Rael, and Jackson); *id.,* Exhs. B-15 - B24 (complaint against

---

policymaker; no policy of allowing excessive use of force or executing illegal search warrants and absence of showing of custom).  He does not.

As a detention officer, McClure's position does not implicate any supervisory or administrative authority whatsoever.  There is no evidence showing that he had any such authority either.  At the very least there is one position between Administrator and detention officers.  According to one affidavit, the Lieutenant of Operations oversees the "day-to-day operations of the jail."  *Martinez Report,* Exh. G, ¶ 3. On the day in question the person holding that position was Cheryl Roach.  *Id.*  She was not on duty when the incident occurred, and Plaintiff does not seek to hold her liable for the incident.  *See id.* at ¶ 4. Moreover, whether a person is deemed a final policymaker is a matter of state law.  Although the parties have not addressed the issue, state law clearly does not delegate that authority to detention officers.  When the New Mexico statutes speak of duties in terms of county jails, they refer to sheriffs, jail administrators, and independent contractors.  *See e.g.,* N.M. STAT. ANN. §§ 33-3-5 through 33-3-8.

Terrazas);

!   Two newspaper articles, one concerning the rapes and the FBI's
    investigation into an inmate beating that occurred in 2002. *See
    Doc. 99,* Exh. B-1 (re: rape cases), *Doc. 118,* Exh. 3 (duplicate of
    same); *Doc. 93,* Exh. E (duplicate of same); *Doc. 114,* Exh. 1 (FBI
    investigation); and

!   Fielder's affidavit, which asserts that:  he told Gentry he was smart
    to not put up a fight because the "rule" is for officers to help each
    other out; he reported McClure's subsequent beating inmates to his
    supervisors, who did nothing; and he knows that his superiors,
    specifically Major Roach, were made aware of officers assaulting
    inmates but  took no action. *Fielder Aff.,* ¶¶ 8, 13-15.

Defendants assert that Plaintiff's proof is too meager to establish the widespread prior

abuse necessary to show a pattern to put the county on notice. *Doc. 104* at 4.  They further argue

that "none of the evidence offered by Gentry is admissible or relevant to his claims against

Defendants," *id.* at 3, because the rape allegations are dissimilar and occurred after his beating, *id.*

at 6; because Gentry provided no information about the list of thirteen cases against Steele; *id.* at

7, and because and none of those cases resulted in Steele or the county being held liable for

excessive use of force, *id.* at 7-8.

However, I am cognizant that Plaintiff has had no opportunity to conduct discovery and

his difficulties in providing specifics on the lawsuits he has found and cited.  Moreover, many of

the cited cases are archived making a detailed inquiry difficult for him, not to mention the court

and counsel.[28]  Furthermore, while the authorities cited by Defendants do establish that a handful

---

[28]   Plaintiff submitted documents showing that, after securing the lists of cases, he asked this court
how much it would cost to secure copies of the "original complaint and docket entries" for Steele cases.
*Doc. 118,* Exh. 1, p. 3.  The response was that for four of cases cost would exceed $250.  The rest of the
cases are archived in Denver.  *Id.,* Exh. 2, p.1.  He then asked just for the costs of securing the complaints
in all of the cases, *see id.,* Exh. 2, p. 2, and indicates that he will submit those copies if they are made
available to him, *Doc. 98* at 12.

of prior incidents is insufficient to establish a persistent and widespread pattern, *see Doc. 106* at 5

n.4, Defendants nonetheless confine their analysis to the dozen Steele suits and do not address the

list of some 100 cases against the county, *see also Brown v. Margate,* 842 F. Supp. 515, 518

(S.D. Fla. 1993) ("Plaintiff's burden was to show that a pervasive policy . . . existed, not that any

specific number of incidents occurred.  Put differently, a smaller number of incidents where the

investigation and resulting disciplinary actions were inadequate may be more indicative of a

pattern than a larger number of incidents where the department fully and satisfactorily addressed

the matter and responded appropriately.").

　　　　I am concerned, however, that permitting discovery on the failure to train/supervise

theories may unnecessarily and unduly delay these proceedings.  If the jury believes McClure's

version of events and finds that McClure used reasonable force, neither Steele in his official

capacity nor the Board could be liable under Section 1983.  *See Trigalet v. City of Tulsa,* 239

F.3d 1150, 1155-56 (10th Cir. 2001) (holding that even if a city's police policies, training, and

supervision are unconstitutional, the city cannot be held liable under § 1983 if the officers did not

actually commit a constitutional violation).  Moreover, it appears that Plaintiff would not be

entitled to any greater relief on a municipality claim than if he succeeds on the individual claim

against McClure.

　　　　Thus, even though I do not recommend dismissal of the municipal liability claim at this

juncture, I also do not recommend that the case proceed to discovery on that claim.  Instead, I

recommend bifurcating the claims and proceeding to discovery and trial only on the excessive use

of force claim against McClure individually.  If McClure's conduct is found to be constitutional,

then the claims against Steele individually and the municipality must also be dismissed.  *E.g.,*

*Trigalet,* 239 F.3d at 1155-56.

Because Plaintiff is proceeding *pro se* and demanded a jury trial in his complaint, the court should also consider whether the appoint counsel.  Although Plaintiff has demonstrated his ability to present his claims and I am confident he can continue to do so, for the sake bringing the McClure claim to trial before a jury in an expeditious and efficient matter, I recommend that District Judge Armijo request that the Pro Se Civil Rights Selection Committee review the matter for possible appointment of counsel under the Court's Pro Bono Plan.

In light of the recommendation to bifurcate and to refer the matter to the Committee, Plaintiff's motions for discovery and to stay this second set of proposed findings are presently moot and should be denied without prejudice, *see Docs. 110, 116,* and Defendants' motion to dismiss the demand in Plaintiff's complaint for attorney fees is premature, *see Doc. 78* at 24; *Doc. 97* at 27.

Wherefore,

**IT IS HEREBY RECOMMENDED** that, because there were no objections, my first set of proposed findings be adopted *(Doc. 71)* and, therefore:

1.  Defendant's first motion to dismiss *(Doc. 20)* be DENIED;

2.  Defendant's second motion dismiss *(Doc. 54)* be GRANTED IN PART AND DENIED IN PART; and

3.  Plaintiff's § 1982 claim be DISMISSED.

**IT IS FURTHER RECOMMENDED** that the other motions presently before me be decided as follows:

4.  As discussed in footnotes 6 and 23, Plaintiff's motion to strike *(Doc. 115)* be DENIED;

5.  As discussed in footnotes 8 and 23, Defendants' motion to strike *(Doc. 103)* be GRANTED and Exhibit A to Plaintiff's objections to the Martinez Report *(Doc. 99, Exh. A)* be STRICKEN AS REDUNDANT;

6.  As discussed in footnotes 8 and 23, the motion by Defendants to strike portions of the Fielder Affidavit, which they raised in responses, be DENIED;

7.  Defendants' first motion for partial summary judgment *(Doc. 78)* be GRANTED IN PART AND DENIED IN PART;

8.  Defendants' second motion for partial summary judgment *(Doc. 80)* be DENIED;

9.  Plaintiff's motions to hold this matter in abeyance and for discovery *(Docs. 110, 116)* be DENIED WITHOUT PREJUDICE AS PRESENTLY MOOT; and

**IT IS FURTHER RECOMMENDED,** as a result of the above recommended dispositions of the motions currently pending, that:

10.  Plaintiff's conspiracy claims be DISMISSED (see footnote 25);

11.  Plaintiff's medical care claims be DISMISSED;

12.  Plaintiff's claims against Steele and McClure in their official capacities be DISMISSED AS REDUNDANT of his claims against the Board;

13.  Plaintiff's claim for punitive damages against the Board be DISMISSED (see footnote 22);

14.  Plaintiff's First Amendment claim be subsumed in his excessive use of force claim;

15.  The presiding judge bifurcate the claims, stay discovery on the municipal liability claims, and proceed to jury trial on the excessive use of force claim against McClure individually; and

16.  The presiding judge refer this matter to the Pro Se Civil Rights Selection Committee for review and possible appointment of counsel under the Court's Pro Bono Plan for the trial on the excessive force claim.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have**

**appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____

UNITED STATES MAGISTRATE JUDGE